F. J. Busse, Inc., Petitioner *v.* Department of General Services, Respondent.

540

Argued September 14, 1979, before Judges MEN-CER, BLATT and MacPHAIL, sitting as a panel of three.

*James F. Manley*, with him *Burns, Manley & Little*, for petitioner.

*Barbara Sumple*, with her *Arnold L. Wainstein*, Assistant Attorney General, *Theodore A. Adler*, Chief Counsel, and *J. Justin Blewitt*, Acting Attorney General, for respondent.

OPINION BY JUDGE MacPHAIL, December 5, 1979:

This is an appeal from an order of the Board of Arbitration of Claims (Board) denying contract damages to F. J. Busse, Inc. (Busse).

On May 25, 1972, Busse and the General State Authority (GSA) entered into a contract for the construction of a fountain at Point State Park in Pittsburgh, Pennsylvania, where the Allegheny and Monongahela Rivers join to form the Ohio River. This area has been subject to frequent flooding in years past. Busse began construction on May 30, 1972, and on June 23, 1972, when the grading and excavation work was nearly completed, Hurricane Agnes deposited approximately six to eight inches of dirt and silt on the construction site which Busse had to remove in order to complete construction. Busse submitted a change

order for more than $85,000, the cost of the additional work required to remove the silt and mud. The GSA granted Busse an extension of time to perform its contract but did not accept or execute the change order forwarded to it by the architect. The GSA did attempt to collect federal reimbursement funds for the flood damage and indicated that it would pay Busse any funds recovered. Unfortunately for Busse, the federal authorities refused to make any payment. At all material times GSA maintained that the risk of loss from the damages wrought by the hurricane was on Busse. After the construction was completed, Busse filed a complaint against GSA with the Board, the decision of which is the subject of this appeal.

We think that the GSA has succinctly stated the narrow issue to be decided by this Court—who must bear the loss from a destruction of part of the unfinished work which the contractor had contracted to do where that destruction is caused by an act of God through no fault of either of the contracting parties? Although both parties agree that the hurricane was "an act of God" and that the consequent damage was caused by no fault of either of the contracting parties, Busse contends that: (1) the Board committed fundamental error when it failed to find that the hurricane caused an increased scope of the work contemplated by the contract as well as a change of conditions at the job site; (2) the Board erred as a matter of law when it failed to find that Busse was excused from performance because the condition of the job site was changed and performance was thereby rendered impossible; (3) the Board erred when it found that under the terms of the contract the risk of flooding was on Busse; and (4) the Board erred as a matter of law when it concluded that in order to find in Busse's favor it would have to rewrite the terms of the contract. GSA, of course, contends that the findings of the

Board are supported by substantial evidence and that its order is in accordance with the law.

Our law is to the effect that where one of two innocent persons must sustain a loss, the law will place that burden on the party that has agreed to sustain it. *Reading Steel Products v. Alexander,* 47 Dauphin 369 (1939). In their carefully researched briefs, both counsel have referred us to cases where the courts have come down on both sides of the question now before us, but in nearly all of those cases, the decisions reached depended on which party the terms of the contract imposed the risk of loss. In the instant case the Board found that the contract placed the risk of flooding on Busse by virtue of the language found in subparagraphs 1.2.2, 7.1 and 11.2.3 of the contract.

Subparagraph 1.2.2 states, *inter alia,* that the contractor assumes all risks resulting from any changes in conditions which may occur during the progress of the work "except as provided in subparagraph 12.1.6." That subparagraph reads as follows:

Should concealed conditions encountered in the performance of the Work which is unascertainable from the plans, Contract Documents, visit to the site and reasonable investigation be at variance with the conditions indicated by the Contract Documents or should unknown physical conditions below the surface of the ground be of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Contract, be encountered, the Contract Sum shall be equitably adjusted by Change Order upon claim by either party made within seven (7) working days after the first observance of the conditions.

Subparagraph 7.1 deals with excavation generally and although it mentions "removal of all soil," we do

not think that its provisions are applicable to the facts of this case because the "removal of all soil" is used conjunctively with the term "excavation."

Subparagraph 11.2.3 provides:

> The risk of damage to the construction Work due to the perils covered by the said fire policy with extended coverage, *as well as any other hazard* which might result in damage to the construction Work, is that of the Contractor and Surety, and no claims for such loss or damage shall be recognized by the Authority, nor will such loss or damage excuse the complete and satisfactory performance of the contract by the Contractor. (Emphasis added.)

The Board noted in its opinion that the parties have the right to make their own contract and inasmuch as Busse agreed to assume all insurable risks and damage from "any other hazard," it had thereby assumed responsibility for the damage to the construction site resulting from the hurricane. The Board also concluded that the results of the hurricane amounted to a change in condition during the course of construction for which Busse assumed full responsibility in subparagraph 1.2.2. The Board discounted the exception of subparagraph 12.1.6 noted in subparagraph 1.2.2 because subparagraph 12.1.6 dealt with concealed or subsurface conditions and did not pertain to flooding or the deposit of silt on the construction site.

Busse argues that it tried unsuccessfully to obtain flood insurance and therefore did not assume that risk and that the result of the hurricane caused the conditions contemplated by subparagraph 12.1.6. We agree with the Board that reimbursement to the contractor under the provisions of subparagraph 12.1.6 is limited to "concealed conditions" and unknown subsurface conditions, neither of which pertains to the results of Hurricane Agnes.

Busse's reliance upon the "emergency" provisions set forth in subparagraph 10.3.1 is likewise misplaced for the language in that section deals with emergency actions taken by a contractor to *prevent* loss. Here, Busse acted to repair damage already done.

We conclude that the terms of the contract, specifically subparagraphs 1.2.2 and 11.2.3, do place the risk of the hurricane loss on Busse.

Even in the absence of contractual language imposing the risk on Busse, our law is that a contractor is presumed to have assumed the risk of unforeseen contingencies arising during the course of the work unless performance is rendered impossible by an act of God. *General State Authority v. Osage Co.*, 24 Pa. Commonwealth Ct. 276, 355 A.2d 845 (1976). There is no dispute that a hurricane is an act of God, but the flooding did not make performance of the contract impossible as that term has been construed under the law. Legal impossibility means not only strict impossibility, but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved. *Albert M. Greenfield & Co. v. Kolea*, 475 Pa. 351, 380 A.2d 758 (1977) (quoting Restatement of Contracts §454 (1932)). Here, flood damage did not make performance impracticable, even though it did make it more expensive. *See* Restatement of Contracts §467, Comment b, Illustration 1 (1932).

Busse points to the architect's approval of the change order and GSA's efforts to recover the cost of the change order from the federal government as evidence that GSA was obligated to pay for the damage to the site. Again, we must disagree. The architect made it quite clear in his testimony that when he processed the claim for payment he was making no effort to interpret the contract. In any event, subparagraph 2.2.5 of the contract provides that the architect's interpretation of the requirements of the contract docu-

ments is only "in the first instance," the fair inference being that the GSA would make the final decision. Certainly, GSA's efforts to obtain reimbursement from the federal government for the contractor could not be construed as anything more than a demonstration of GSA's understanding of Busse's unfortunate situation. We do not construe such actions as a voluntary assumption of risk, an admission of liability or a waiver of the contract's provisions on the part of GSA.

Order affirmed.

### ORDER

AND Now, this 5th day of December, 1979, the order of the Board of Arbitration of Claims dated September 8, 1978, denying the claim of F. J. Busse, Inc., against the General State Authority is affirmed.